In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-4260

ANGEL L. RODRIGUEZ,

*Plaintiff-Appellant*,

*v.*

PLYMOUTH AMBULANCE
SERVICE, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:06-CV-01091-AEG—**Charles N. Clevert, Jr.**, *Judge*.

ARGUED SEPTEMBER 19, 2008—DECIDED AUGUST 18, 2009

Before POSNER, RIPPLE and EVANS, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Angel Rodriguez, proceeding *in forma pauperis*, filed this action under 42 U.S.C. § 1983 against Plymouth Ambulance Service, St. Agnes Hospital, Waupun Memorial Hospital and various Plymouth employees. Mr. Rodriguez claims that the medical providers, while acting under color of state law, violated the Eighth Amendment's prohibition against cruel and un-

usual punishment by exhibiting deliberate indifference to his serious medical needs. The district court, screening the complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1), dismissed the case for failure to state a claim upon which relief could be granted. For the reasons given in this opinion, we affirm in part and vacate and remand in part the judgment of the district court.

# I

## BACKGROUND

### A.[1]

Mr. Rodriguez is an inmate at the Kettle Moraine Correctional Institution ("KMCI") in Wisconsin. On October 8, 2005, he began spitting up blood and experiencing abdominal pain. An ambulance from the Plymouth Ambulance Service ("Plymouth"), with emergency medical technician-paramedics ("EMT") Mike Lubbert and Nadie Becker aboard, arrived at KMCI to transport Mr. Rodriguez to St. Agnes Hospital ("St. Agnes"). In the ambulance, Mr. Lubbert inserted a temporary intravenous line ("IV") into Mr. Rodriguez's right arm. The IV caused Mr. Rodriguez pain, and he notified Mr. Lubbert and Ms. Becker.

Mr. Rodriguez also complained about the "serious pain" he was experiencing to the nurses at the emergency

---

[1] Given the procedural posture of this case, we must accept as true the factual account in Mr. Rodriguez's complaint.

department of St. Agnes and asked that they adjust the IV. R.1 at 6. However, Mr. Rodriguez was informed by a nurse that St. Agnes did not have an active medical account with the prison system and that he therefore would be transferred to Waupun Memorial Hospital ("Waupun Memorial"). During the hour that Mr. Rodriguez waited to be transferred, he continued to experience pain.[2]

At Waupun Memorial, Mr. Rodriguez informed the nurses that he was in pain from the IV. The nurses flushed and adjusted the IV, causing his arm to bleed profusely and causing him "more severe pain." R.1 at 6A. The IV was not removed until four days after its insertion. By that time, Mr. Rodriguez's arm was swollen and completely immobile. When he complained to the staff at Waupun Memorial and requested pain relief medication, they provided him with an ice bag and stated that they could do nothing more. *Id.*

Upon his return to KMCI, the prison's medical staff noticed that Mr. Rodriguez's arm was severely infected and that pus was oozing from the site where the IV had been inserted. After running a test, the staff determined that Mr. Rodriguez had contracted methicillin-resistant staphylococcus aureus. Mr. Rodriguez was treated at the prison with antibiotics, but he continues to experience pain in his arm.

---

[2] It appears from the medical records attached to Mr. Rodriguez's complaint that, while at St. Agnes, he received some medication by IV.

**B.**

The district court took the view that the allegations of the complaint arguably suggest that the named defendants had operated under the color of state law. Relying on our decisions in *Burrell v. City of Mattoon*, 378 F.3d 642, 650 (7th Cir. 2004), and *Proffitt v. Ridgeway*, 279 F.3d 503, 507 (7th Cir. 2002), the court based its conclusion on the principles that a private person can become liable under section 1983 by conspiring with a public official to deprive a person of a constitutional right or by becoming a willful participant with the state or its agents in such a deprivation.

The district court then turned to the merits of Mr. Rodriguez's Eighth Amendment claim. It determined that there was no arguable basis for relief and dismissed the complaint.

**II**

**DISCUSSION**

This case is significantly more complex than the district court's opinion suggests. To ensure clarity of analysis and of presentation, we shall discuss the principles of law that guide our decision in Sections A through C and then apply those principles to the facts of this case in Section D.

**A.**

As a threshold matter, we shall address the appropriate standard of review and the sufficiency of Mr. Rodriguez's complaint.

We review de novo a district court's dismissal of a complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A(b)(1). *DeWalt v. Carter*, 224 F.3d 607, 611-12 (7th Cir. 2000); *Sanders v. Sheahan*, 198 F.3d 626, 626 (7th Cir. 1999). We must accept the facts alleged in Mr. Rodriguez's complaint as true and draw all reasonable inferences in Mr. Rodriguez's favor. *See DeWalt*, 224 F.3d at 612.

The sufficiency of a complaint is governed by Federal Rule of Civil Procedure 8(a). That rule provides that to state a claim for relief, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Additionally, because Mr. Rodriguez filed his complaint without the assistance of counsel, we construe liberally the factual allegations of his complaint. *See Wynn v. Southward*, 251 F.3d 588, 592 (7th Cir. 2001). The complaint in this case is certainly adequate under these standards.

We do note, however, that Mr. Rodriguez mentions in the text of his pro se complaint several individuals whom he believes were responsible for his injury, but

whose names he does not know. In *Billman v. Indiana Department of Corrections*, 56 F.3d 785 (7th Cir. 1995), we addressed at some length the principles that must govern our consideration of this situation:

> Ordinarily a tort victim who does not know who the tortfeasor is cannot sue. To know that one has been injured tortiously but not by whom is a ground for tolling the statute of limitations, but it is not a ground for filing suit before the plaintiff knows who injured him and who therefore should be named as the defendants. But this is not an ordinary case. Billman is a prison inmate. His opportunities for conducting a precomplaint inquiry are, we assume, virtually nil. . . . Even without doing any investigating, Billman knew enough to know that a terrible thing had been done to him. But he did not know enough to identify the culprits or to determine whether they had the confluence of knowledge . . . and power . . . necessary to hold them liable for inflicting a cruel and unusual punishment.

> We do not think that the children's game of pin the tail on the donkey is a proper model for constitutional tort law. If a prisoner makes allegations that if true indicate a significant likelihood that someone employed by the prison system has inflicted cruel and unusual punishment on him, and if the circumstances are such as to make it infeasible for the prisoner to identify that someone before filing his complaint, his suit should not be dismissed as frivolous. The principle is not limited to prisoner cases. It applies

to any case in which, usually because the plaintiff has been injured as the consequence of the actions of an unknown member of a collective body, identification of the responsible party may be impossible without pretrial discovery. . . . Of course, eventually the plaintiff must discover the names of the defendants in order to serve summonses on them and thus establish the court's personal jurisdiction, without which the suit must be dismissed. But his initial inability to identify the injurers is not by itself a proper ground for the dismissal of the suit. Dismissal would gratuitously prevent him from using the tools of pretrial discovery to discover the defendants' identity.

Our point is not that Billman should be given a break because he lacks legal skills. Or that his complaint should, like any complaint governed by the Federal Rules of Civil Procedure, be read generously. . . . Our point is that because Billman is a prisoner he may not be in a position to identify the proper defendants, or all of them, in his complaint. . . . We think it is the duty of the district court to assist him, within reason, to make the necessary investigation.

*Id*. at 789-90 (citations omitted).

**B.**

Mr. Rodriguez brought this claim under 42 U.S.C. § 1983. To state a claim under this section, the plaintiff must establish the deprivation of a right secured by the Con-

stitution or laws of the United States. *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). He also must show that the alleged deprivation was committed by a person acting under the color of state law. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). We now examine the two basic principles of section 1983 jurisprudence that must govern our decision: (1) that there is no respondeat superior liability under section 1983 and (2) that a plaintiff must show that a private entity acted under the color of state law to state a claim under section 1983.

## 1.

It has long been established that there is no respondeat superior liability under section 1983.[3] Although this principle typically surfaces in the context of municipal corporations,[4] we have applied the same principle to situations where the employer is an individual.[5] The same is true of a private corporation. As we noted in *Johnson v. Dossey*, 515 F.3d 778 (7th Cir. 2008):

> The corporate defendants require a bit more attention. Both [defendants] claim to be sued solely under a theory of respondeat superior or vicarious liability. Like public municipal corporations, they cannot be sued solely on that basis: a "private corporation is

---

[3]  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).

[4]  *See, e.g., id*. at 694.

[5]  *See, e.g., Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857 (7th Cir. 1999).

> not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982); *see also Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760 (7th Cir. 2002). However, like a municipality, a private corporation can be liable if the injury alleged is the result of a policy or practice, or liability can be "demonstrated indirectly 'by showing a series of bad acts and inviting the court to infer from them that the policy-making level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned . . . the misconduct of subordinate officers.'" *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004).

*Id.* at 782 (alteration in original).

### 2.

We next consider the principle that, to be held liable under section 1983, a private entity must have acted under color of state law.

### a.

When a plaintiff brings a section 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private entity acted under

the color of state law.[6] This requirement is an important statutory element because it sets the line of demarcation between those matters that are properly federal and those matters that must be left to the remedies of state tort law. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50 (1999); *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 349-51 (1974). Both the Supreme Court and the lower federal courts have acknowledged the difficulty of determining whether a private entity has acted under the color of state law. As our colleagues on the Second Circuit have noted, this determination constitutes "one of the more slippery and troublesome areas of civil rights litigation." *Int'l Soc'y for Krishna Consciousness v. Air Canada,* 727 F.2d 253, 255 (2d Cir. 1984) (quotation marks omitted). However, we have not been left foundering in uncharted waters; recent years have witnessed a long line of decisions in which the Supreme Court has given us significant guidance.[7]

At its most basic level, the state action doctrine requires that a court find such a "close nexus between the

---

[6] The Supreme Court has said, in its more recent cases, that this statutory criterion is the equivalent of the "state action" requirement in Fourteenth Amendment analysis. *See, e.g., NCAA v. Tarkanian,* 488 U.S. 179, 182 n.4 (1988); *see also West v. Atkins,* 487 U.S. 42, 49 (1988); *Georgia v. McCollum,* 505 U.S. 42, 53 n.9 (1992); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 641 n.* (1991).

[7] *See generally* Martin A. Schwartz and Erwin Chemerinsky, *Dialogue on State Action*, 16 Touro L. Rev. 775 (2000).

State and the challenged action" that the challenged action "may be fairly treated as that of the State itself." *Jackson*, 419 U.S. at 351 (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176 (1972)). In *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), the Supreme Court wrote that "[t]he ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Id.* at 838 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1981)). In most cases, the state actor is an officer or employee of state government, and it is easy to conclude that the person's actions are fairly attributable to the state. However, the Court has long recognized that, on some occasions, the acts of a private party are fairly attributable to the state because the party has acted in concert with state actors. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 170 (1970) (observing that "a State is responsible for the discriminatory act of a private party when the State, by its law, has compelled the act"). In *Blum v. Yaretsky*, 457 U.S. 991 (1982), the Supreme Court held that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* at 1004.

Moreover, the Court has set forth several tests for us to employ in evaluating the "range of circumstances" that might constitute state action. *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001). We recognize that these formulations are susceptible to

semantic variations, conflations and significant overlap in practical application; we further recognize that they "lack rigid simplicity." *Brentwood Acad.*, 531 U.S. at 294. Nevertheless, we believe that it is useful to describe these tests as the symbiotic relationship test,[8] the state command and encouragement test,[9] the joint participation doctrine[10] and the public function test.[11]

---

[8] *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961). The Court did not use the term "symbiotic relationship" in *Burton*, but later referred to *Burton* as establishing such a test. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 175 (1972).

[9] *See Moose Lodge No. 107*, 407 U.S. at 176-77 (holding that a private club, which had refused to admit African-American members, was not a state actor because, although the club was subject to a state's "detailed" regulation of liquor licenses, the state regulation did not "foster or encourage racial discrimination").

[10] *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931 (1982) (noting that a "private party's joint participation with a state official in a conspiracy to discriminate would constitute both 'state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights' and action 'under color of law for purposes of the statute'" (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) (internal quotation marks omitted))).

[11] *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974) (declining to hold that the supplying of utility service is a state action, because it "is not traditionally the exclusive prerogative of the State"). We noted in *Vickery v. Jones*, 100 F.3d 1334 (7th Cir. 1996), that the court has rarely found this test met in modern times. *See id.* at 1345 (collecting cases).

**b.**

The Supreme Court also has provided us with some guidance for determining when nongovernmental health care providers that serve state prisoners should be considered state actors. Nevertheless, we still remain, to some degree, in uncharted waters.

Our analytical voyage must begin with *West v. Atkins*, 487 U.S. 42 (1988). In *West*, the Supreme Court held that, when a physician is employed by the state to provide medical services to state prison inmates, that physician acts under the color of state law for purposes of section 1983. The physician's conduct in providing medical services, said the Court, "is fairly attributable to the State." 487 U.S. at 54. In *West*, the Court primarily was addressing the state's argument that *Polk County v. Dodson*, 454 U.S. 312 (1981), controlled the situation before it. In *Polk*, the Court had held that "a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." 454 U.S. at 325.[12] In *West*, the state had argued that, because the physician also exercises independent professional judgment, he cannot be considered a state actor. In disagreeing with this argument, the Court relied upon its decision in *Estelle v. Gamble*, 429 U.S. 97 (1976). In *Estelle*, the Court

---

[12] In *Montano v. Hedgepeth*, 120 F.3d 844, 851 (8th Cir. 1997), the Court of Appeals for the Eighth Circuit applied the Supreme Court's decision in *Polk County v. Dodson*, 454 U.S. 312 (1981), to the ecclesiastical activities of a prison chaplain.

had held that a medical director of a state prison, who was also the treating physician, could be held liable under section 1983 as a state actor for allegedly administering substandard medical treatment to a prisoner. The Court explained its rationale by noting that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* at 103.

Turning to the facts before it, the Court in *West* reasoned that, because the state controls the medical care of inmates to the exclusion of all other sources, the state has a constitutional obligation under the Eighth Amendment to provide adequate medical care. The physician employed by the state is therefore obliged to treat prison inmates in fulfillment of the state's responsibility. When he does so, the Court concluded, he is "'clothed with the authority of state law.'" *West*, 487 U.S. at 55 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

Notably, in *West*, the Court did not rely on the particular contractual arrangement that the physician had with the state, but, rather, emphasized the function of the physician:

It is the physician's *function* within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State. Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the *relationship among the State, the physician, and the prisoner.* Contracting out prison medical care does not relieve the State of its constitutional duty to pro-

vide adequate medical treatment to those in its cus-
tody, and it does not deprive the State's prisoners
of the means to vindicate their Eighth Amendment
rights. The State bore an affirmative obligation to
provide adequate medical care to West. The State
delegated that function to respondent Atkins; and
respondent voluntarily assumed that obligation by
contract.

487 U.S. at 55-56 (emphasis added) (footnote omitted).

This emphasis on the *function* performed by the
physician as opposed to the physician's particular con-
tractual relationship with the state was the subject of
further elaboration by the Court:

It is the physician's *function* while working for the
State, not the amount of time he spends in the perfor-
mance of those duties or the fact that he may be em-
ployed by others to perform similar duties, that deter-
mines whether he is acting under color of state law.
In the State's employ, respondent worked as a physi-
cian at the prison hospital fully vested with state
authority to fulfill essential aspects of the duty,
placed on the State by the Eighth Amendment and
state law, to provide essential medical care to those
the State had incarcerated.

*Id.* at 56-57 (emphasis added) (footnote omitted).

The situation before us today is not identical to the one
before the Court in *West.* However, in applying *West,* our
focus must be on the particular *function* of the medical
care provider in the fulfillment of the state's obliga-

tion to provide health care to incarcerated persons.[13] In addressing this problem, we have no definitive guidance from our own circuit. Nevertheless, some of our earlier cases, decisions from other circuits[14] and helpful contributions from district courts across the Country[15] light the way. With this assistance, we now turn to an examination of *West* in an effort to identify the considerations that must guide our decision.

---

[13] The Supreme Court has applied this functional approach to determine whether a particular individual acted under the color of state law in a variety of contexts. *See, e.g., Georgia v. McCollum*, 505 U.S. 42, 54 (1992) (defendant's exercise of peremptory challenges); *Branti v. Finkel*, 445 U.S. 507, 517 (1980) (public defender making personnel decisions on behalf of the state).

[14] *Styles v. McGinnis*, 28 Fed. App'x 362 (6th Cir. 2001); *Connor v. Donnelly*, 42 F.3d 220 (4th Cir. 1994).

[15] *See, e.g., Estate of Rice v. Corr. Med. Servs.*, 596 F. Supp. 2d 1208, 1218-19 (N.D. Ind. 2009) (collecting cases). *See also Wendt v. Hutchinson*, No. 4:08-CV-12485, 2008 WL 4280117 (E.D. Mich. Sept. 11, 2008); *Gallegos, Jr. v. Slidell Police Dep't, et al.*, No. 07-6636, 2008 WL 1794170 (E.D. La. April 18, 2008); *Anglin v. Aspen, Colo.*, 552 F. Supp. 2d 1229 (D. Colo. 2008); *Neal v. Anspaugh-Kisner, et al.*, No. 07-10671, 2008 WL 506336 (E.D. Mich. Feb. 22, 2008); *Griffis v. Medford, et al.*, No. 05-3040, 2007 WL 2752373 (W.D. Ark. Sept. 20, 2007); *Williams v. Brann*, No. 02-C-940, 2006 WL 1518979 (E.D. Wis. May 30, 2006); *Sykes v. McPhillips*, 412 F. Supp. 2d 197 (N.D.N.Y. 2006); *Callahan v. Sw. Med. Ctr., et al.*, No. CIV-03-1434-F, 2005 WL 1238770 (W.D. Okla. April 29, 2005); *Martinson v. Bruce, et al.*, No. 88-3243-S, 1991 WL 241857 (D. Kan. Oct. 22, 1991); *McIlwain v. Prince William Hosp., et al.*, 774 F. Supp. 986 (E.D. Va. 1991).

**i.**

At the outset, we note that in *West*, the Supreme Court did not rely explicitly on any of the tests that it had developed in earlier cases to discern whether private activity could be "fairly attributable to the State." *Rendell-Baker*, 457 U.S. at 838 (quotation marks omitted). It was not until the Court's later decision in *American Manufacturers Mutual Co. v. Sullivan*, 526 U.S. 40 (1999), that it said explicitly that its holding in *West* was based on the public function test. The Court simply noted that in *West*, "the State was constitutionally obligated to provide medical treatment to injured inmates, and the delegation of that traditionally exclusive public function to a private physician gave rise to a finding of state action." *Id.* at 55.[16] In discerning how to apply *West* to other medical care situations involving incarcerated persons, we therefore must keep in mind the theoretical underpinnings of the public function test. As one scholar has summarized:

> The theory is that if the government must satisfy certain constitutional obligations when carrying out its functions, it cannot avoid those obligations and deprive individuals of their constitutionally pro- tected rights by delegating governmental functions to the private sector. The delegation of the function should be accompanied with a delegation of constitu- tional responsibilities.

---

[16] The Supreme Court's statement in *American Manufacturers Mutual Co. v. Sullivan*, 526 U.S. 40 (1999), was foreshadowed by our holding in *Wade v. Byles*, 83 F.3d 902, 906 n.6 (7th Cir. 1996).

Martin A. Schwartz, 1 Section 1983 Litigation Claims and Defenses § 5.14 [A] at 5-100 (4th ed. 2003).

**ii.**

*West* tells us that the functional analysis ought to focus on the relationship among the state, the health care provider *and* the prisoner. *West* also tells us that one of the factors that we must weigh, in assessing that trilateral relationship, is the setting in which the medical care is rendered. The Court emphasized that a medical care provider in the correctional setting inevitably is affected by that setting in the performance of his medical functions. "Unlike the situation confronting free patients, the nonmedical functions of prison life inevitably influence the nature, timing, and form of medical care provided to inmates." *West,* 487 U.S. at 56-57 n.15. Medical care is simply "not unaffected by the fact that the State controlled the circumstances and sources of a prisoner's medical treatment." *Id*.

We do not read this statement as indicating that all medical advice rendered outside of the prison walls is exempt from the state action doctrine simply because it is provided outside the prison. Indeed, the Court's statement makes clear that state control is highly relevant. In the context of modern American medical practice, it is not feasible to render a great deal of medical care within the confines of a penal institution. The state clearly does not relieve itself of its responsibility to provide medical care solely on account of the venue where those services are rendered. *See Conner v. Donnelly*,

42 F.3d 220, 225-26 (4th Cir. 1994) (holding that a private physician who treated a prisoner's orthopedic problem in the physician's office outside the prison was acting under color of state law). Rather, it seems that the Court's admonition in *West* is intended to remind us to assess the *degree* to which the professional decisions made in rendering the care are influenced by the status of the patient as a prisoner and the directives of the state, as the ultimate responsible party for the prisoner's health care, with respect to the manner and the mode of care.

Giving significant weight to the degree to which the work of the private medical provider is controlled or influenced by the state simply acknowledges the general concern, in any state action analysis, that the degree of state control or coercion is a very significant factor in determining whether the private individual's actions can be "fairly attributable to the state." *Lugar v. Edmondson Oil*, 457 U.S. 922, 937 (1982). While this factor is not often articulated in applying the public function test in other contexts, it certainly must be weighed in the medical context when assessing the relationship among the state, the private actor and the prisoner.

### iii.

Although *West* tells us that the contractual relationship between the state and the medical care provider cannot be the *focus* of our inquiry, *see West*, 487 U.S. at 55, it nevertheless must be an important factor in determining whether the private health care provider has

entered into its relationship with the state and the prisoner on a *voluntary* basis. We see no basis in the Supreme Court's case law for concluding that a private entity can be burdened with the responsibilities of the state for the care of its prisoners unless the entity assumes that responsibility voluntarily, and one of the principal ways, indeed the principal way, by which a private entity would undertake such a responsibility is by entering into a contractual relationship.[17] When a party enters into a contractual relationship with the state penal institution to provide specific medical services to inmates, it is undertaking freely, and for consideration, responsibility for a specific portion of the state's overall obligation to provide medical care for incarcerated persons. In such a circumstance, the provider has assumed freely the same liability as the state. Similarly, when a person accepts employment with a private entity that contracts with the state, he understands that he is accepting the responsibility to perform his duties in conformity with the Constitution.

In contrast, private organizations and their employees that have only an incidental and transitory relationship with the state's penal system usually cannot be said to have accepted, voluntarily, the responsibility of acting for the state and assuming the state's responsibility

---

[17] There may be other methods by which an individual can enter into such a relationship with the state, such as accepting certain benefits under a regulatory scheme in return for the assumption of such a responsibility.

for incarcerated persons. For instance, an emergency medical system that has a preexisting obligation to serve all persons who present themselves for emergency treatment hardly can be said to have entered into a specific voluntary undertaking to assume the state's special responsibility to incarcerated persons. *See* Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd et seq. Rather, it has undertaken to provide a specific service, emergency medical care, to *all* who need those services. The fact that it does not, and cannot, discriminate against incarcerated individuals does not mean that it has agreed to step into the shoes of the state and assume the state's responsibility toward these persons. It has not "'assume[d] an obligation to the [penological] mission that the State, through the [prison], attempts to achieve.'" *West*, 487 U.S. at 51 (quoting *Polk County*, 454 U.S. at 320). In these circumstances, matters of professional judgment do in fact predominate over the achievement of state objectives. *See id.* at 52 n.10.

### iv.

We believe that it is also important to emphasize that the Supreme Court in *West* did not focus simply on the relationship of the private medical provider to the state. It also considered the relationship of the private provider to the prisoner. In doing so, we think that the Court meant to emphasize that, in order to be liable *as the state* for the provision of medical services, the private provider must have a direct, not an attenuated, relationship with the prisoner-patient. In the fulfillment of its

responsibilities to the state's prison population, a state must arrange for goods and services with many entities. To the degree that a private entity does not replace, but merely assists the state in the provision of health care to prisoners, the private entity's responsibility for the level of patient care becomes more attenuated, and it becomes more difficult to characterize its actions as the assumption of a function traditionally within the exclusive province of the state.[18] Such a situation simply does not implicate the basic concern of *West* that a state ought not be able to contract away its responsibility for providing adequate prisoner health care.

These considerations do not provide us, however, with a pat answer as to whether any particular medical care arrangement constitutes state action through the application of the public function doctrine. They are, however, the factors that *West* indicates that we must apply in our assessment of the individual case. As the Supreme Court told us in *Brentwood Academy*, what is fairly attributable to the state "is a matter of normative judgment, and the criteria lack rigid simplicity." 531 U.S. at 295.

---

[18] If the assistance is undertaken under the affirmative direction of the state, or in collaboration with the state, the activity may be considered to be a state action, independent of the public function doctrine. *See Lugar*, 457 U.S. at 941; *Moose Lodge No. 107*, 407 U.S. at 177.

**C.**

The Eighth Amendment's prohibition against cruel and unusual punishment, which embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency," prohibits punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle*, 429 U.S. at 102 (quotation marks omitted). It thus requires that the government provide "medical care for those whom it is punishing by incarceration." *Id.* at 103. The Eighth Amendment safeguards the prisoner against a lack of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* Accordingly, "deliberate indifference to serious medical needs" of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution. *Id.* at 104. This indifference includes intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment. *Id.* at 104-05. By contrast, mere negligence in the provision of medical care does not constitute a violation of the Amendment. *Id.* at 105. Rather, "a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (citing *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000)).

In *Gutierrez v. Peters*, 111 F.3d 1364 (7th Cir. 1997), we addressed the appropriate principles to be applied in cases involving delays in the treatment of painful

medical conditions. In applying the standard articulated in *Estelle*—deliberate indifference to a serious medical need—we noted that it contained both objective and subjective elements. "The former requires that the deprivation suffered by the prisoner be 'objectively, sufficiently serious.'" *Gutierrez*, 111 F.3d at 1369 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation marks omitted). The latter requires that the state official, or the person acting in his stead, act with deliberate indifference. *Id.* We also recognized that delays in treating painful medical conditions, even if not life-threatening, may support an Eighth Amendment claim. *Id.* at 1371; *see also Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (holding that a complaint alleging that a prison nurse refused to give pain medication prescribed by a physician stated a claim under the Eighth Amendment); *Edwards v. Snyder*, 478 F.3d 827, 830-32 (7th Cir. 2007) (holding that a prisoner's claim against a doctor survived dismissal under 28 U.S.C. § 1915A where the prisoner was forced to wait two days for proper treatment of his severely injured finger, leading to "permanent disfigurement, loss of range of motion, and the infliction of unnecessary pain"). By contrast, minor pains cannot give rise to such a claim:

> Deliberately to ignore a request for medical assistance has long been held to be a form of cruel and unusual punishment . . . but this is provided that the illness or injury for which assistance is sought is sufficiently serious or painful to make the refusal of assistance uncivilized. . . . A prison's medical staff that refuses to dispense bromides for the sniffles or

minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution.

*Id.* at 1372. (alterations in the original) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

## D.

Having set forth the principles of law that must govern our decision, we now turn to the narrative in Mr. Rodriguez's complaint to determine whether any of his claims should have survived the screening process under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1).

## 1.

### Plymouth Ambulance Service and its Employees

In his complaint, Mr. Rodriguez claims that an ambulance from Plymouth, with EMT Lubbert and EMT Becker aboard, transported him from the prison to St. Agnes. Mr. Rodriguez further claims that EMT Lubbert "inserted a temporary I.V. in [his] right arm [which was] stable only enough to get some fluids running until the transport caravan arrive[d] at St. Agnes Hospital." R.1 at 6. This initial insertion of the IV, therefore, was performed for a legitimate medical reason and not to inflict gratuitously pain on Mr. Rodriguez. At worst, it was a negligent act.

Mr. Rodriguez's second allegation is more serious. He alleges that after EMT Lubbert inserted the IV, both EMTs ignored his complaints of pain. As we already have discussed in detail, the turning of a blind eye to the legitimate medical needs of a prisoner-patient, including his complaints of pain, can constitute a violation of the Eighth Amendment. We also have recognized that delays in treating non-life-threatening but painful conditions constitute a failure to address a serious medical need. *Gutierrez*, 111 F.3d at 1371. *See also Edwards*, 478 F.3d at 831 (holding that a plaintiff who dislocated his finger and was forced to wait two days for treatment, leading to the infliction of unnecessary pain, permanent disfigurement and the loss of range of motion, suffered a painful medical condition and stated an Eighth Amendment claim); *O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006) (holding that pain from minor burns which resulted from plaintiff lying in vomit constituted an "objectively serious medical condition") (internal quotation marks omitted).

We think that this allegation is sufficient to state a claim under the Eighth Amendment. The misinsertion of an IV needle may be simple negligence, but allowing the situation to go unremedied may well produce significant pain and result in a serious medical situation. Depending on the evidence produced at later stages of the litigation, an Eighth Amendment violation may well be established.

However, before this claim may survive screening, another issue must also be resolved through limited

discovery: Whether Plymouth, EMT Lubbert and EMT Becker are state actors. We cannot tell, on the face of the complaint alone, the relationship of Plymouth, and through it, the EMTs, to the prison system or to Mr. Rodriguez. *West* requires that this trilateral relationship be analyzed in order to determine whether their actions fairly can be attributed to the state. Some parts of this relationship are evident in the complaint. The transport was conducted in a custodial atmosphere: A correctional officer was present, and the ambulance was escorted by a prison vehicle. However, whether this arrangement in any way contributed to the EMTs' inattention to Mr. Rodriguez's complaints of pain is not discernible from the complaint. We cannot tell, nor do we believe that Mr. Rodriguez can be charged fairly with knowing, whether Plymouth rendered this service by contract with the prison system or as part of a municipal service available to all persons needing emergency medical care in the area.

Finally, we must address whether this claim may proceed against all the defendants involved in the transportation of Mr. Rodriguez to St. Agnes. In the complaint, Mr. Rodriguez named as defendants the EMTs who attended to him, as well as Plymouth. However, he alleges no wrongdoing on the part of the corporation, no failure to train its employees and no policy of the corporation that violated his constitutional rights. The company is not liable under section 1983 for the actions of its employees under a theory of respondeat superior. Consequently, the district court properly dismissed Plymouth.

Mr. Rodriguez also named Plymouth's Director of Operations, Kyle Marohl, as a defendant. He alleges, however, no personal wrongdoing by Mr. Marohl, and Mr. Marohl can incur no liability under a theory of respondeat superior. There is no allegation that he failed to train the EMTs or that their actions in ignoring Mr. Rodriguez's claims of pain were based on a policy for which Mr. Marohl had any responsibility. The district court therefore properly dismissed the complaint with respect to him.

## 2.

### St. Agnes Hospital

The next defendant named by Mr. Rodriguez is St. Agnes. Mr. Rodriguez alleges that, upon his arrival at St. Agnes, a nurse drew blood and injected him with pain medication. He states that he "pleaded to the emergency nurses to adjust or fix the temporary I.V. so it wouldn't cause him pain," but that the nurse declined to do so because the hospital did not have "an active medical account" with KMCI. R.1 at 6. He states that he waited for an hour at St. Agnes, in pain, before an ambulance arrived to transfer him to another hospital.

We do not believe that the allegations against St. Agnes state a cause of action under section 1983. The complaint notes that St. Agnes affirmatively declined to assume the state's responsibility to provide medical care to Mr. Rodriguez. Whatever may have been the hospital's responsibilities under other provisions of law, a question

not before us today, it is clear that it is not alleged to have been acting in the state's stead. St. Agnes had not assumed voluntarily any of the state's duties. Any care that it did render, it undertook in its own facility in response to an emergency.[19] We must conclude, therefore, that the complaint makes clear that St. Agnes did not operate under the color of state law.[20]

### 3.

### Waupun Memorial Hospital

Finally, Mr. Rodriguez alleges that treatment of his arm by the staff at Waupun Memorial constituted deliberate indifference to his serious medical needs and constituted the gratuitous infliction of pain.

With respect to Waupun Memorial, we believe that the allegations of the complaint are sufficient to allege state

---

[19] The clinical notes attached to Mr. Rodriguez's complaint suggest that some testing was performed at St. Agnes prior to his transport to Waupun Memorial and that Mr. Rodriguez received some medication through the IV.

[20] Mr. Rodriguez does not name as defendants any specific members of the staff of St. Agnes. He specifically does relate, however, that he complained of his pain to the nurses assigned to service emergencies and that they refused to relieve his suffering. While we believe that his narrative would be sufficient to permit him to engage in limited discovery to learn the names of the individuals, the lack of an affirmative assumption of any voluntary state action on their part precludes the necessity of such a step.

action. Here, an examination of the trilateral relationship of the state, Waupun Memorial and the prisoner-patient demonstrates that the provider was acting in the stead of the state in providing medical care to Mr. Rodriguez. The complaint affirmatively alleges that he was placed in a prison ward of the hospital, an allegation that suggests strongly that Waupun Memorial, unlike St. Agnes, had an ongoing relationship with the prison authorities for the care of prisoner-patients in need of hospitalization. Additionally, the complaint makes clear that his stay at this facility was not simply for emergency treatment, but rather involved a stay of several days. Under these circumstances, therefore, it is clear that Mr. Rodriguez has alleged that his treatment at Waupun Memorial was tied to the state's responsibility for his overall medical care. *See Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991) (holding that a private company that administers a prison can be held liable under section 1983); *cf. Richardson v. McKnight,* 521 U.S. 399, 412-13 (1997) (holding that private prison guards were not entitled to assert the defense of qualified immunity, but leaving open the question of whether the operations of a private prison company constitute state action).

In his complaint, Mr. Rodriguez specifically mentions only the hospital as a defendant. As in the case of Plymouth and St. Agnes, however, there is no allegation that his alleged maltreatment was due to a policy of the institution or to a failure to train its personnel. There can be no respondeat superior liability for the actions of the staff members under section 1983. We therefore must conclude that the district court properly dismissed the hospital as a defendant.

Mr. Rodriguez's complaint, however, also includes specific allegations against individual staff members.[21] Mr. Rodriguez alleges that the Waupun Memorial staff members made several inept attempts to correct the IV insertion, including pushing the IV into his arm "as far as it [could be] pushed," R.1 at 6A, and refused to treat the attendant pain. The only relief administered, according to the complaint, was an ice pack. At this stage, we cannot say that these allegations describe only simple negligence, as opposed to deliberate inattention to a worsening medical condition (that later resulted in a serious infection and at least temporary loss of use of an arm) and deliberate indifference to continuing pain. Notably, the complaint explicitly contrasts the ice pack treatment administered by the Waupun Memorial staff to the antibiotic therapy and laboratory analysis initiated by the prison hospital staff shortly thereafter. This contrast does not suggest a simple professional disagreement as to choice of remedies, but the difference between meaningful treatment and non-treatment. As we stated in *Gutierrez*, 111 F.3d at 1371, "delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims." In this case, Mr. Rodriguez has alleged that Waupun Memorial failed to treat his arm during the entire duration of his hospital stay, causing him extreme pain and resulting in the

---

[21] *See Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) (holding that "private prison-management corporations *and their employees* may be sued under § 1983 by a prisoner who has suffered a constitutional injury" (emphasis added)).

development of a serious and contagious infection. He further has alleged implicitly that his treatment at Waupun Memorial was not based on a legitimate medical judgment, given the aggressive treatment he subsequently received at the KMCI infirmary. *See Duckworth,* 532 F.3d at 679 ("A jury can 'infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (alterations in the original)).

Under these circumstances, we believe that Mr. Rodriguez should have the opportunity to engage in limited discovery to ascertain the identity of these staff members, whose conduct he has explicitly described. If he does so, the allegations of the complaint with respect to the conduct of those individuals are sufficient to state a claim under section 1983.

## Conclusion

The judgment of the district court is affirmed in part and vacated and remanded in part for further proceedings consistent with this opinion. No costs are assessed in this case.

AFFIRMED in part,
VACATED and REMANDED in part