In the

# United States Court of Appeals

### For the Seventh Circuit

No. 06-3602

SHAWN HALLINAN and WAYNE HAREJ,

*Plaintiffs-Appellants*,

*v.*

FRATERNAL ORDER OF POLICE OF CHICAGO
LODGE NO. 7 and FRATERNAL ORDER OF POLICE
OF ILLINOIS,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 2586—**Joan Humphrey Lefkow,** *Judge.*

ARGUED APRIL 30, 2007—DECIDED JUNE 25, 2009

Before ROVNER, WOOD, and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge*. After being expelled from their labor union, Chicago police officers Shawn Hallinan and Wayne Haraj sued the union and its parent organization for violations of their First and Fourteenth Amendment rights. The district court found that the plaintiffs had failed to plead the state action necessary

to maintain an action pursuant to § 1983 and, consequently, the court granted the unions' motion to dismiss. We affirm.

**I.**

Plaintiffs Hallinan and Harej are long time City of Chicago police officers and were members in good standing of the City's police union, the Fraternal Order of Police Chicago Lodge No. 7 (FOP Lodge 7 or Union) until they were suspended in June 2005 and then expelled on September 6 of that same year. FOP Lodge 7 is a labor organization with the exclusive right to represent and bargain on behalf of police officers employed by the City. The Fraternal Order of Police of Illinois oversees FOP Lodge 7.

Both men were leaders of a group of Union members opposed to the FOP Lodge 7 president, Mark Donohue, and his political organization. During the March 2005 election cycle, Hallinan and Harej formed an opposition slate of twenty candidates to oppose President Donohue and the incumbent officers. During the course of the campaign, the plaintiffs uncovered evidence that Donahue had under-reported significantly his salary on a report filed with the Attorney General. Harej reported the discrepancy to the Attorney General's office and the FOP twice corrected the form. The under-reporting issue became a major one in the campaign and Hallinan and Harej discussed the error among Union members and publically, including with the media.

Soon after the March 25 election, Donahue and his slate members began proceedings to suspend and then expel both Hallinan and Harej from membership in the Union. On April 19, 2005, FOP Lodge 7 officers filed disciplinary charges against the two men and on June 25, while the charges were pending, suspended them. In July 2005, the FOP Lodge 7 held hearings regarding the disciplinary charges. Hallinan and Harej alleged in their complaint that the Union hearing panel was comprised of their political rivals. The panel recommended that the Union expel both plaintiffs, and on September 6, 2005, the FOP Lodge 7 board accepted the recommendation and voted to expel the two men.

The plaintiffs appealed the decision to the FOP Illinois. FOP Illinois held a hearing on the appeal and considered only whether the plaintiffs had received due process. The hearing panel's recommendation, which the FOP Board accepted, was to deny the appeal and uphold the plaintiffs' expulsion.

For unexplained reasons, Hallinan and Harej continued to pay full dues to the Union through an automatic payroll deduction mechanism until just after Hallinan and Harej filed a September 16, 2005 complaint with the Illinois Labor Relations Board (ILRB).[1] Because

---

[1] That complaint to the ILRB alleged that in expelling them as members, the Union violated its duty of fair representation to Hallinan and Harej. The Board dismissed the charges concluding that under Illinois law the duty of fair representation

(continued...)

of that ILRB complaint, FOP Lodge 7 became aware that Hallinan and Harej, although expelled, were still paying full Union dues. In response, the Union, over the plaintiffs' objections, informed the City that it should make Hallinan and Harej fair-share pay-ers—persons who make payments for activities essential to collective bargaining but who are not union members and do not pay membership dues. The City com-plied—rendering Hallinan and Harej fair-share payers and deducting the appropriate fair-share amount from their paychecks to send to the Union. Hallinan has offered and tendered payment of the amount of full Union dues to the FOP Lodge 7, but the Union has refused payment. FOP Lodge 7 currently receives Hallinan's and Harej's fair-share payments and continues to represent the two men in all matters concerning their wages, hours, and working conditions as police officers for the City of Chicago.

On May 9, 2006, Hallinan and Harej filed a complaint in the district court alleging First and Fourteenth Amend-

---

[1] (...continued)
covered only the conduct of a labor union in collective bargain-ing and grievance handling and that the duty of fair representa-tion did not extend to the right of union membership. The appeal before us is not from the ruling of the ILRB. This appeal arises from a separate suit, filed by plaintiffs in the district court below alleging federal constitutional and state law violations. We mention the proceedings before the ILRB only because it was the complaint in those proceedings that alerted the Union that the plaintiffs, although expelled, continued to pay full Union member dues.

ment violations pursuant to 42 U.S.C. § 1983 as well as pending state law claims for breach of the Union constitution and breach of the duty of fair representation. The suit named as defendants both the FOP Lodge 7 and the FOP Illinois. On August 24, 2006, the District Court granted the defendants' motion to dismiss, brought pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ruling that the court lacked subject matter jurisdiction as the plaintiffs had failed to plead adequately the state action necessary for maintaining an action pursuant to § 1983. (R. 41 p.1). The court granted leave to the plaintiffs to amend the complaint to add allegations of illegal state action. When the plaintiffs declined to do so, the district court entered a final order on September 19, 2006, dismissing the case with prejudice. We review that decision *de novo*. *Richards v. Kiernan*, 461 F.3d 880, 883 ( 7th Cir. 2006).

## II.

The plaintiffs in this case allege constitutional violations redressable through 42 U.S.C. § 1983. The First and Fourteenth Amendments to the Constitution protect citizens from conduct by the government, but not from conduct by private actors, no matter how egregious that conduct might be. *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191, 109 S. Ct. 454, 461 (1988); *Messman v. Helmke*, 133 F.3d 1042, 1044 (7th Cir. 1998). Unions are not state actors; they are private actors. *Messman*, 133 F.3d at 1044. This does not end the matter, however, because the conduct of private actors, in some cases, can constitute state action. Consequently, the outcome of this case

depends on whether the conduct of the Union can be characterized as state or purely private action.

In order to be characterized as state action, "the deprivation [of constitutional rights] must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the [S]tate or by a person for whom the State is responsible . . . [and] the party charged with the deprivation must be a person who may fairly be said to be a [S]tate actor." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937, 102 S. Ct. 2744, 2753-54 (1982). The Supreme Court has identified numerous situations when private conduct takes on the color of law. *See, e.g., id.* at 939, 102 S. Ct. at 2754-55; *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Assoc.*, 531 U.S. 288, 295-96, 121 S. Ct. 924, 930 (2001). Private action can become state action when private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights, *Dennis v. Sparks*, 449 U.S. 24, 27-28, 101 S. Ct. 183, 186 (1980); where the state compels the discriminatory action, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S. Ct. 1598, 1605 (1970); when the state controls a nominally private entity, *Pa. v. Bd. of Dirs. of City Trusts*, 353 U.S. 230, 231, 77 S. Ct. 806, 807 (1957); when it is entwined with its management or control, *Evans v. Newton*, 382 U.S. 296, 299, 301, 86 S. Ct. 486, 488, 489 (1966); when the state delegates a public function to a private entity, *Terry v. Adams*, 345 U.S. 461, 484, 73 S. Ct. 809, 821 (1953); *West v. Atkins*, 487 U.S. 42, 56-57, 108 S. Ct. 2250, 2259-60 (1988); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628, 111 S. Ct. 2077, 2087 (1991), or when there is such a close nexus between the state and the challenged action that seemingly private behavior rea-

sonably may be treated as that of the state itself. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S. Ct. 449, 453 (1974).

Over time, Supreme Court and Seventh Circuit precedent have revealed that these cases do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment. *Brentwood*, 531 U.S. at 295, 121 S. Ct. at 930; *Tarpley v. Keistler*, 188 F.3d 788, 792 (7th Cir. 1999) ("All of the tests, despite their different names, operate in the same fashion: [ ] by sifting through the facts and weighing circumstances.").

> What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. . . . [N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.

*Brentwood Academy*, 531 U.S. at 295-96, 121 S. Ct. at 930 (internal citation omitted).

Hallinan and Harej begin their argument by pointing out, correctly, that the existence of an exclusive union agency agreement with a government employer implicates the state action doctrine. *Chicago Teachers Union Local No. 1 v. Hudson*, 475 U.S. 292, 301, 106 S. Ct. 1073 (1986). Under the exclusive agency arrangement, a single labor organization has sole authority to bargain with a particular employer over wages, hours, and working conditions of employees. For employees, the unified bargaining agent

provides strength in numbers and economies of scale. *See Tavernor v. Ill. Fed'n of Teachers*, 226 F.3d 842, 844 (7th Cir. 2000). For employers it protects them from conflicting demands of different groups of workers. Imagine the difficulties that would ensue if union A bargained for and received a different salary and set of benefits for its members than did union B. Giving exclusive bargaining rights to one particular union meets the needs of the union, the members it represents, and the employer. *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 221-22, 97 S. Ct. 1782, 1792 (1977) (outlining the problems with multiple representatives including inter-union rivalries, dissension in the work force, the undermining of the advantages of collectivization etc.). Consequently, the National Labor Relations Act (29 U.S.C. §§ 151-169) is premised on such a system of exclusive representation.

With all if its benefits, however, the exclusive agency agreement does come at a cost. When a government employer requires its employees to associate with a particular private organization, it infringes on its employees' First Amendment associational rights and on liberty rights protected by the Fourteenth Amendment. *See Abood*, 431 U.S. at 222; *Hudson*, 475 U.S. at 301, 106 S. Ct. at 1073. The Supreme Court long ago resolved this problem by requiring employers to allow employees to opt out of union membership. *Abood,* 431 U.S. at 221-22, 97 S. Ct. at 1792. To prevent free riders from securing the benefits of collective bargaining without contributing to its cost, however, an employer may have a collective bargaining agreement with a union that requires employees who opt out of membership to contribute their

fair share of the costs of collective bargaining. *Id*.; *Tavernor*, 226 F.3d at 844.

As the plaintiffs rightly point out, this forced association, even in the fair-share payer scenario, still imposes in some way on associational rights. *See Hudson*, 475 U.S. at 301, 106 S. Ct. at 1073; *Abood*, 431 U.S. at 222, 97 S. Ct. at 1793; *Hudson v. Chicago Teachers Union Local No. 1*, 743 F.2d 1187, 1193 (7th Cir. 1984), *aff'd,* 475 U.S. 292, 106 S. Ct. 1066 (1986). It is possible, for example, that the union's leadership, in its negotiations over wages and benefits, strongly favors employer-sponsored retirement plans, but a particular fair-share payer believes in higher salaries without government sponsored retirement plans. Or perhaps the union is negotiating for a health plan that includes coverage for fertility treatment to which the employee is morally opposed. The fair-share payer may have no choice but to support financially this bargaining activity (or, of course, wage the difficult battle for union de-certification). The imposition on associational rights, however, is lawful in that it goes no further than necessary to prevent the free-rider problem and ensure the smooth operation of the exclusive agency shop. *Hudson*, 743 F.2d at 1193-94. As the *Abood* court put it,

> To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. But the judgment [of our precedent] is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union

shop to the system of labor relations established by Congress.

*Abood,* 431 U.S. 209, 222, 97 S. Ct. at 1793 (1977).

To sum up, the plaintiffs are certainly correct that when a government employer forces its employees to join a union it is imposing on associational rights. The plaintiffs argue that this is the mirror image of such a forced association case—"a reverse fair-share case" as they put it. But the reverse case of an *employer forcing* an employee to join a union is the case where the *employer prohibits* its employees from associating with a union. Clearly this too would constitute a violation of First Amendment associational rights, but it is not what happened here. Here, it was the Union, rather than the employer, that barred the plaintiffs from membership. And union actions taken pursuant to the organization's own internal governing rules and regulations are not state actions. *Messman v. Helmke,* 133 F.3d 1042, 1044 (7th Cir. 1998); *see also Leahy v. Bd. of Trs. of Cmty. Coll. Dist. No. 508,* 912 F.2d 917, 921-22 (7th Cir. 1990). Thus the simplistic "reverse fair share" moniker turns out to be inapt and we are thrust back to the initial question of whether something about this Union's relationship with the City turned what is generally private conduct into state action. That is, was the Union, for example, acting in concert or collusion with the City; was it acting with powers delegated to it by the City or state law; or somehow inextricably entwined with the City? In this case we conclude that it was not.

Hallinan and Harej appear to argue that because state action is present when a state employer forces employees

to associate with a union, every action the union takes becomes action taken under color of law. "[G]overnmental regulation or participation in some of the affairs of unions," however, "does not consequently make every union activity so imbued with governmental action that it can be subjected to constitutional restraints." *Driscoll v. Int'l Union of Operating Eng'rs, Local 139*, 484 F.2d 682, 690 (7th Cir. 1973). If it did, state action could be assumed in every case involving a collective bargaining agreement between a union and a public entity, but our court and others have found otherwise. *See, e.g., id.* (finding no state action in internal union rule requiring all candidates for union office to execute a non-communist affidavit); *Leahy*, 912 F.2d at 921-22 (finding that plaintiff failed to adequately allege state action in portion of suit against union representing employees of city employer); *see also Jackson v. Temple Univ.*, 721 F.2d 931, 933 (3d Cir. 1983) (plaintiff failed to satisfy state action requirement for claim against union representing employees of public employer). Rather, "the very activity of a private entity which a plaintiff challenges must be supported by state action." *Driscoll*, 484 F.2d at 690. Membership regulations and disciplinary procedures are quintessentially internal affairs. *See Messman*, 133 F.3d at 1044. In this case, no matter how they dress it, the plaintiffs are challenging only the Union's internal act of expelling them from membership in the organization. Even taking the facts of the complaint in the light most favorable to Hallinan and Harej, there is no evidence that the City exercised such coercive power, provided such significant encouragement, or was sufficiently entangled in any ways that the choice to expel the plaintiffs must, in law, be deemed

to be that of the City. *See Blum v. Yaretsky*, 457 U.S. 991, 1004, 457 S. Ct. 2777, 2786 (1982).

The complaint in this case alleges that Union members filed disciplinary charges against Hallinan and Harej, that the Union suspended them before a hearing, that the Union conducted the hearings with biased panel members, and that the Union board ultimately voted to expel the plaintiffs. Hallinan and Harej further alleged that the Illinois FOP denied their appeal and upheld their expulsion. The complaint does not allege that the City was in any way involved with the suspension or expulsion or hearing. Nor does it allege a conspiracy, compulsion, or delegation of duties. Indeed, the complaint alleges that the Union expelled the plaintiffs from their Union membership pursuant to the FOP Lodge 7's constitution and bylaws and not because of any provision in the collective bargaining agreement or any other agreement with the City. Regarding the City, the complaint merely alleges that the City requires the plaintiffs to support the Union and that the City assisted the Union by refusing to deduct the full amount of membership dues as the plaintiffs desire. (R. at 1, ¶¶ 10, 12, 54, 56).

The City's deduction of fair-share dues came about as a result of, and was not the cause of, the plaintiffs' expulsion. In fact, had the City done nothing at all and simply continued to deduct full membership dues and forward them to the Union, the plaintiffs would be in the exact same position as they are in now. The City could not compel the Union to accept the expelled members and the Union merely would be obliged to refund immediately any amount of over-payment. In response to the

Union's expulsion, the City simply reacted by taking the required administrative steps to fulfill its ministerial obligations to deduct $X in dues for members and $Y in fees for fair-share payers. The City's deductions had no effect on whether the plaintiffs were expelled and will have no effect on whether the Union allows them to re-join. Decisions about membership are between the Union and its police officer members. In this way, this case resembles the integral facts of *Blum*, 457 U.S. 991, 102 S. Ct. 2777 (1982). In *Blum*, private nursing homes independently determined that some of their residents did not require the level of care that they were receiving and consequently transferred those patients to a lower level of care. *Id.* at 995. The homes then notified the city officials who were responsible for administering the Medicaid program and ultimately the city adjusted the payments to the homes according to the level of care provided and the city's statutory obligations. *Id.* The Supreme Court concluded, "[t]hat the State responds to such actions by adjusting benefits does not render it *responsible* for those actions. The decisions about which respondents complain are made by physicians and nursing home administrators, all of whom are concededly private parties." *Id.* at 1005 (emphasis in original).

Hallinan and Harej admit that the City has not directly expelled the plaintiffs nor prevented their membership, but rather, they argue that the state action comes in the form of "non-obvious" involvement of the City. The non-obvious involvement stems largely from the language of the Collective Bargaining Agreement

between the City and the FOP Lodge 7 which, in Section 3.1 states,

    A. Each officer who on the effective date of this Agreement is a member of the Lodge, and each officer who becomes a member after that date, shall, as a condition of employment, maintain their membership in good standing in the Lodge during the term of this Agreement.

    B. Any present officer who is not a member of the Lodge shall, as a condition of employment, be required to pay fair share (not to exceed the amount of Lodge dues) of the cost of the collective bargaining process and contract administration. All officers hired on or after the effective date of this Agreement and who have not made application for membership shall, on or after the thirtieth day following completion of their probationary period, also be required to pay a fair share of the cost of the collective bargaining process and contract administration.

(R. at 28, Ex. C, p.2).

Hallinan and Harej interpret this language to mean that although new hires have the choice of becoming full members or simply fair-share payers, officers who were members on the effective date of the collective bargaining agreement can never subsequently opt-out and become fair-share payers. Consequently, the plaintiffs argue, any officer who is expelled from the Union can be (and theoretically must be) terminated by the City. This is neither a fair reading of the collective bargain-

ing agreement nor constitutionally workable under the First Amendment. It could not be more clear that all persons "who object to nonrepresentational activities of the union have the right to pay fees that exclude contributions to those activities," and become fair-share payers. *Tavernor,* 226 F.3d at 844; *see also Hudson*, 475 U.S. at 294, 106 S. Ct. at 1069; *Abood*, 431 U.S. at 234, 97 S. Ct. at 1799. It would be an odd reading of the contract indeed to allow only new hires and not long-standing employees to opt out of membership. Such a reading would mean that an employee who had been a member could never opt out of membership even if the Union began to pursue a political and ideological agenda with which the member disagreed. Suppose, for example, that the Union began to contribute to pro-choice causes to which the member was religiously opposed. Under the Union's reading, that member would be forced to maintain her association with a group to which she was ideologically opposed or lose her job. Such a forced association would undoubtedly violate the First Amendment as described in *Abood*. Not only would it be a stretch to read this first sentence of Section 3.2 as applying only to new hires, we need not. The language of that sentence contains no such restriction. Rather, that first sentence in subsection B is clear that "[a]ny present officer who is not a member of the Lodge shall, as a condition of employment, be required to pay fair share (not to exceed the amount of Lodge dues) of the cost of the collective bargaining process and contract administration." In other words any officer who is not a member—either by choice or due to expulsion—can and

must become a fair-share payer, just as Hallinan and Harej have. "Terms that are lawful as written may not be given an illegal spin as part of an effort to curtail the obligation they create." *Cent. States, S.E. and S.W. Areas Pension Fund v. Joe McClelland, Inc.,* 23 F.3d 1256, 1258 (7th Cir. 1994).

The City cannot terminate the officers for non-compliance with Section 3.1; as fair-share payers, they have complied. The Union, therefore, does not have the power to have the officers terminated from their employment, as the plaintiffs allege. The decision to expel any member is regulated only by internal union regulations which are neither influenced nor compelled by the City or any other government agency. There is no entanglement, coercion, control, delegation, encouragement or any other indicia of state action. A state "normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]*." Blum*, 457 U.S. at 1004, 102 S. Ct. at 2786. The state does not govern the union's internal affairs.

What appears to be driving this appeal is the need to correct an injustice inflicted upon Hallinan and Harej. If their allegations are accurate—and for purposes of the motion to dismiss we accept all factual allegations in the complaint and draw all reasonable inferences from those facts in the plaintiffs favor (*Richards v. Kiernan*, 461 F.3d 880, 882 (7th Cir. 2006))—Hallinan and Harej were expelled from the Union simply for challenging

incumbent officers and exposing wrongdoing. It goes without saying that unions should tolerate and indeed encourage dissension among their ranks and encourage whistle-blowing of nefarious and questionable practices by union leadership. The Constitution, however, does not require private organizations to provide free speech or due process rights to its members in matters concerning their purely private and internal affairs. "The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *California v. Sierra Club*, 451 U.S. 287, 297, 101 S. Ct. 1775, 1781 (1981). Here, the Constitution requires state action which the plaintiffs have failed to effectively plead.

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a claim for lack of subject matter jurisdiction. A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. Although the district court ultimately concluded that it lacked subject matter jurisdiction because the plaintiffs had failed to plead the state action necessary for maintaining an action pursuant to § 1983—a conclusion that invokes Fed. R. Civ. P. 12(b)(1)—the court should have instead dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Because the plaintiff properly pleaded a colorable claim arising under a law of the United States, the district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511, 126 S. Ct. 1235, 1244 (2006). Proof of state action, in contrast, is an element of the claim. *See id.; Lugar v. Edmondson Oil Co.*,

*Inc.*, 457 U.S. 922, 930, 102 S. Ct. 2744, 2750 (1982) (describing the state action requirement as an element of a § 1983 claim). Indeed, the defendant's motion to dismiss properly moved the court to dismiss for failure to state a claim under Rule 12(b)(6), alleging that the plaintiffs had failed to plead state action. Defendants moved to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) solely on the pendant state law claim.

The plaintiffs failed to plead adequately state action and thus the district court's grant of the defendants' motion to dismiss is AFFIRMED.