In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――

No. 22-2096

CYLINDA SCOTT and MICHAEL SCOTT, individually and on be-
half of their minor child, BABY A.

*Plaintiffs-Appellants,*

*v.*

UNIVERSITY OF CHICAGO MEDICAL CENTER and
STEPHANIE LIOU,

*Defendants-Appellees.*

―――――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-00820 — **Sara L. Ellis**, *Judge.*

―――――――――

No. 22-2108

BRIAN BOUGHER and ANGELA BOUGHER, individually and on
behalf of their minor daughter, BABY B., *et al.,*

*Plaintiffs-Appellants,*

*v.*

SILVER CROSS HOSPITAL AND MEDICAL CENTERS, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-06324 — **Sara L. Ellis**, *Judge*.

_____

ARGUED MAY 23, 2023 — DECIDED JULY 11, 2024

_____

Before SYKES, *Chief Judge*, and BRENNAN and PRYOR, *Circuit Judges*.

PRYOR, *Circuit Judge*. These cases concern three sets of parents who declined preventative medical care for their newborn babies in private hospitals.[1] Because the parents refused the treatment, hospital employees contacted the Illinois Department of Children and Family Services ("DCFS"), which in turn investigated the parents for medical neglect. In one case, hospital staff took temporary protective custody of the child.

The parents sued under 42 U.S.C. § 1983, alleging that the hospitals and certain medical professionals violated their families' Fourth and Fourteenth Amendment rights. Because private entities are susceptible to § 1983 liability only when engaged in state action, the district court dismissed both cases. We affirm.

_____

[1] The parents are Cylinda and Michael Scott, parents to Baby A; Brian and Angela Bougher, parents to Baby B; and Jason and Sarah Kosek, parents to Baby K. In the district court, the parents were parties in two separate cases, both presided over by the same judge. The cases have been consolidated for the purposes of this appeal.

## I. BACKGROUND

For purposes of this appeal, we accept as true all well-pleaded factual allegations in plaintiffs' complaints and draw all reasonable inferences in the parents' favor. *Fehlman v. Mankowski*, 74 F.4th 872, 875 (7th Cir. 2023) (noting that facts are viewed in favor of the party who did not move for dismissal).

### A. The Vitamin K Shot

The State of Illinois requires all obstetric departments to administer a shot of Vitamin K—the vitamin that allows blood to clot normally—to newborns shortly after birth. *See* ILL. ADMIN. CODE tit. 77, § 250.1830(g)(8). The shot has been routinely given to babies since 1961 to protect against hemorrhagic bleeding, which, although rare, can cause brain damage or death in infants.[2] The shot itself comes with risks, which are also rare, including death.[3] The plaintiffs refused the shot for their newborns due to concerns about these risks and for religious reasons.[4]

---

[2] *Vitamin K Deficiency Bleeding*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/vitamin-k-deficiency/fact-sheet/.

[3] The Vitamin K shot carries a "Black Box Warning," the highest safety-related warning the Food and Drug Administration can assign to a drug. *See* Cynthia M. Ho, *A Dangerous Concoction: Pharmaceutical Marketing, Cognitive Biases, and First Amendment Overprotection*, 94 IND. L.J. 773, 814 n.188 (2019) (citing 21 C.F.R. § 201.57(c)(1) (discussing "Black Box Warnings")).

[4] The parents also declined the administration of erythromycin eye ointment, another preventative procedure meant to avoid eye infections in newborns. Because the parents explicitly "focus their argument on the denial of Vitamin K injections," we do too.

### B. DCFS's Vitamin K Policy

DCFS is the Illinois agency charged with receiving and investigating reports of child abuse and neglect. In 2015, DCFS adopted an internal policy—identified as Section H—stating that Vitamin K shots or pills were a "medically necessary" procedure for purposes of child protective services, and that any reports of Vitamin K refusal would be taken as reports of "medical neglect."

Section H also provided guidance to DCFS employees for what to do when a physician informed the agency that she had taken temporary protective custody of a child because the child's parents had refused to consent to necessary medical care for religious reasons. It provided that these physicians should contact the local State's Attorney's Office, and that DCFS would not open an investigation "unless there [was] additional information supporting other allegations of abuse or neglect."

In June 2017, Dr. Paula Jaudes—who, at the time, was DCFS's medical director and a professor of pediatrics at University of Chicago Medical Center—informed the Illinois Department of Health that DCFS had decided to rescind Section H so that refusal of the Vitamin K shot would no longer be considered *per se* medical neglect, mandate a call to DCFS, or prompt a DCFS investigation.

Dr. Jill Glick, a pediatrician at the University of Chicago Medical Center and a member of the DCFS Advisory Board, disagreed with the agency's decision to rescind Section H. She and other pediatricians encouraged high-ranking DCFS officials, including Dr. Jaudes, to re-implement the policy so that refusal of Vitamin K would again be considered neglect and

investigated accordingly. They also asked DCFS to explicitly encourage physicians to take protective custody of children in instances of Vitamin K refusal.

In response to this lobbying, DCFS sent an email to its network in October asking doctors to report refusals of the Vitamin K shot as medical neglect. Both the University of Chicago Medical Center as well as Silver Cross Hospital and Medical Centers agreed that they would do so. In November 2017, DCFS re-adopted Section H as the official agency policy.

The change did not last long. Parents soon began advocating against the policy and, by August 2018, DCFS rescinded Section H for the second time. In a letter to its staff and stakeholders, DCFS explained that it would no longer consider a parent's refusal of Vitamin K to be medical neglect because determining what treatments are considered "medically necessary" fell outside the confines of the agency's "statutory and professional mission and judgment."

### C. Statutory Background

Physicians are "mandatory reporters" in Illinois, meaning they have a statutory duty to "immediately report" cases where "they have reasonable cause to believe that a child" is being neglected. 325 ILCS 5/4(a)(1). The Illinois Abused and Neglected Child Reporting Act defines medical neglect as "not receiving the proper or necessary support or medical or other remedial care recognized under State law as necessary for a child's well-being." 325 ILCS 5/3 ¶ 9. The State has also endowed medical professionals with the power to take protective custody of a child if they believe that leaving the child in the guardians' care would put the child's health or safety

at risk and there is no time to apply for a court order. 325 ILCS 5/5 ¶ 1.

### D. The Parents' Experiences

All three sets of plaintiff parents had similar experiences after refusing the Vitamin K shot on behalf of their newborn children. Despite the efforts of hospital staff to convince the parents to consent to the procedure, none of the newborns ever received the shot.

#### 1. *The Scotts*

Baby A was born to Cylinda and Michael Scott in February 2019 at the University of Chicago Medical Center. At the time, the hospital had an internal policy detailing what staff should do in cases of Vitamin K refusal. It provided that if a parent declined the shot, staff were to notify the attending physician and the hospital's on-call social worker. The physician would then speak with the parents about the risks of Vitamin K refusal. If the parents continued to decline the shot, the physician was to notify DCFS and take protective custody of the child. Hospital staff would then administer Vitamin K without the parents' consent. Only then would temporary custody be lifted.

Pursuant to this plan, the University of Chicago Medical Center staff attempted to convince the Scotts to consent to the Vitamin K shot shortly after Baby A's birth. The parents refused the procedure, prompting Dr. Stephanie Liou, a defendant, to threaten to take Baby A into protective custody and administer the shot without their consent. The Scotts ultimately called the police, who ordered hospital staff not to take the child. Still, the University of Chicago Medical Center reported the Scotts to DCFS, which later investigated the case.

Following a home visit, DCFS concluded the medical neglect report was unfounded and closed the case.

### 2. *The Boughers*

Baby B was born to Angela and Brian Bougher in February 2018 at Silver Cross Hospital and Medical Center. The Boughers promptly informed the treating nurse—Monika Kozuch, a defendant in this case—that they did not want Baby B to receive a Vitamin K shot. In response, Nurse Kozuch removed Baby B from the delivery room and told the new parents that she would report them to DCFS.

When Dr. Miroslaw Skalski, also a defendant, came to the Boughers' hospital room to inform them that their child had low blood sugar and needed formula, the parents had yet to hold their child. When they expressed a desire for Baby B to breastfeed, Dr. Skalski allowed Angela to visit the child in the nursery. After nursing, Angela was told she could not bring the baby back to her room. Nearly thirteen hours after the birth, hospital staff returned Baby B to the Boughers.

The next day, a DCFS case worker notified the Boughers that Silver Cross had confirmed there were no health risks to Baby B, and the medical neglect report would be deemed unfounded. The case worker explained, however, that she would still need to complete a house visit to check on the Boughers' other children. DCFS later contacted the police, who then conducted a welfare check at the Boughers' home the next week. The day after the welfare check, DCFS closed the investigation and concluded the medical neglect report was unfounded.

### 3. *The Koseks*

Baby K was born to Sarah and Jason Kosek in June 2018, also at Silver Cross. During the pregnancy, the Koseks had signed a form indicating their intent to refuse the Vitamin K shot. Following Baby K's birth, however, a Silver Cross nurse informed the Koseks that their decision would trigger a report to DCFS.

About an hour later, a DCFS case worker appeared in the Koseks' hospital room in response to a report of medical neglect. Shortly thereafter, Silver Cross's Head of Pediatrics appeared and introduced himself. He informed the Koseks that Baby K could be taken away from them if they continued to refuse the Vitamin K shot and that he could administer the shot without their consent. Another Silver Cross administrator and a DCFS case worker spoke with the Koseks and echoed these warnings. Ultimately, no one removed Baby K from the parents during their hospital stay. Following a home visit and witness interviews, DCFS closed the investigation and determined the medical neglect report was unfounded.

### E. Procedural History

All three sets of parents brought Fourteenth Amendment claims against the hospitals and the medical professionals with whom they interacted. They alleged that by attempting to coerce them into consenting to the Vitamin K shot by taking away or threatening to take away their newborns, the defendants violated their substantive due process right to family integrity. The Boughers also brought a Fourth Amendment claim against Nurse Kozuch and Dr. Skalski, alleging that the removal of their child constituted an illegal seizure. Because the parents failed to plead sufficiently that the defendants

acted under color of state law when they contacted DCFS and temporarily removed—or threatened to remove—the newborns, the district court granted the defendants' motions to dismiss. *Holderman v. Walker*, No. 19 C 6324, 2021 WL 1192441 (N.D. Ill. Mar. 30, 2021); *Scott v. Walker*, No. 21 C 820, 2022 WL 1421500 (N.D. Ill. May 5, 2022). The parents appeal.[5]

## II. ANALYSIS

We review de novo a Rule 12(b)(6) dismissal for failure to state a claim, meaning we take a fresh look at the legal issues. *Patrick v. City of Chicago*, 81 F.4th 730, 735 (7th Cir. 2023). To survive dismissal, the plaintiffs need to allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The parents bring constitutional claims under 42 U.S.C. § 1983. Because § 1983 liability only extends to private parties when they act "under color of state law," *Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 825 (7th Cir. 2019), the threshold question at the heart of this appeal is whether the defendants—private hospitals and healthcare workers— were engaged in state action at the time of the alleged constitutional violations. This "state action" inquiry is fact-intensive, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961), and is "one of the more slippery and troublesome areas of civil rights litigation," *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009) (quoting *Int'l Soc'y for*

_____

[5] At the district court, several other parents were named as plaintiffs. Some parents also brought claims against current and former DCFS employees for their roles in the incidents. This appeal, however, deals only with claims brought by the Scotts, Koseks, and Boughers against the private hospitals and their employees.

*Krishna Consciousness v. Air Canada*, 727 F.2d 253, 255 (2d Cir. 1984)).[6]

We are not, however, without guidance. The Supreme Court has recognized several scenarios when private entities will be considered state actors for the purpose of a claim pursuant to § 1983. Under the "joint action" or "conspiracy" theory, a private party who conspires with the government to infringe on a plaintiff's rights will be classified as a state actor. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). So, too, will a party performing a function that has traditionally been "the exclusive prerogative of the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974). Courts will also find state action when a private party and the State are interdependent "to the point of largely overlapping identity." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303 (2001). Finally, the plaintiffs assert that we outlined another set of factors in *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d at 823, that likewise supports a finding of state action.

Although we recognize that these scenarios "do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment," *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 816 (7th Cir. 2009), it is helpful to organize our analysis along these lines, especially given that the parties have structured their arguments based on these scenarios.

Before proceeding, though, we must address the issue of waiver. The Boughers and Koseks presented only the

[6] The state action requirement of the Fourteenth Amendment and the "under color of state law" requirement of § 1983 are treated as identical. *See Lindke v. Freed*, 601 U.S. 187, 195 (2024).

conspiracy theory of state action to the district court. They have, therefore, waived any argument that the remaining scenarios support a finding of state action against Silver Cross or its employees. *See Teumer v. General Motors Corp.*, 34 F.3d 542, 546 (7th Cir. 1994) ("The failure to draw the district court's attention to an applicable legal theory waives pursuit of that theory in this court."). The Scotts are the only plaintiffs to have preserved all theories of state action argued on appeal, which we address in turn.

### A. Conspiracy or Joint Action

The parents allege that private hospitals and their staff conspired with state officials from DCFS to violate the parents' constitutional rights. They argue that this conspiracy had two aims: to force parents to consent to Vitamin K shots for their newborns and, failing that, to take—or threaten to take—protective custody of the infants. The parents assert that these joint actions show that the private hospitals and their staff acted "under color of state law" for purposes of § 1983.[7]

---

[7] The parents' counsel explicitly waived at oral argument any contention that the hospitals' policy of *reporting* Vitamin K refusal to DCFS is what forms the basis of joint action with the state. Oral Arg. at 7:47–57. Rightly so, for it is well-established that "merely filing a report of child neglect with a state actor, even if false, is insufficient to create liability under Section 1983." *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (warning against subjecting private parties to constitutional litigation "whenever they seek to rely on some state rule governing their interactions with the community surrounding them"). Reporting medical neglect to DCFS is an independent undertaking, meaning private hospitals and their employees may file as many such reports as they wish without any "badge of [state]

To get past the pleading stage on this theory, the parents must point to more than "mere allegations of joint action or a conspiracy" to demonstrate that the defendants acted under color of state law. *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998). Instead, the plaintiffs must have alleged that the hospitals and DCFS "had a meeting of the minds and thus reached an understanding … to deny" the parents "a constitutional right." *Wilson v. Warren County*, 830 F.3d 464, 468 (7th Cir. 2016) (alterations and citation omitted). We stress that there must have been a real agreement—explicit or implicit—between the parties. Merely working in parallel toward "a common goal" is not the same as conspiring together. *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980) (citation omitted).

We analyze the parents' claims against each hospital (and its employees) separately.

### 1. University of Chicago Medical Center

The Scotts allege that the University of Chicago Medical Center had an internal policy allowing doctors to take protective custody of newborns whose parents refused to allow the administration of Vitamin K shots. They claim that this policy was "developed" and "adopted" "in concert with high-ranking DCFS officials," and that it was inspired by Section H, the DCFS regulation that considered Vitamin K refusal to be tantamount to "medical neglect." As proof of this joint action, the Scotts point to the fact that two employees of the Medical Center—Dr. Jaudes and Dr. Glick—were involved with this DCFS

---

authority," *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998) (citation omitted), and DCFS retains the discretion to respond to those reports as it sees fit.

policy. Ultimately, the hospital's internal policy was brought to bear when Dr. Liou threatened to—but ultimately did not—take the Scotts' newborn into protective custody to administer the Vitamin K shot.

The Scotts' allegations against the University of Chicago Medical Center and Dr. Liou do not reveal a conspiracy with DCFS to infringe on the Scotts' constitutional right to family integrity.[8] While the allegations reveal that the hospital and DCFS shared "a common goal" of administering Vitamin K shots to newborns, *Tarkowski*, 644 F.2d at 1206, there are no allegations that the hospital and DCFS "reached an understanding … to deny" the Scotts their constitutional rights, *Wilson*, 830 F.3d at 468. As the Medical Center rightly notes, the Scotts have not identified who "among the state's many officials" were allegedly a part of the conspiracy. *See Adickes*, 398 U.S. at 152 (finding plaintiff entitled to relief under § 1983 if "she can prove that a Kress employee … and a Hattiesburg policeman somehow reached an understanding" to infringe on her constitutional rights). Moreover, while the Scotts broadly assert that the Medical Center's policy was developed "in concert" with DCFS, our caselaw requires more than "mere allegations of joint action or a conspiracy." *Fries*, 146 F.3d at 458.

The Scotts' arguments also run into several other roadblocks. For one, the Medical Center staff appeared to be operating within the bounds of—or at least inspired by—

---

[8] In their complaint, the Scotts allege that two University of Chicago Medical Center employees—Dr. Jaudes and Dr. Glick—were involved in the reinstatement of the DCFS policy. These individuals, however, are not defendants in this case and did not report the Scotts to DCFS.

applicable Illinois regulations and law. Illinois regulations require the administration of Vitamin K to newborns "shortly after birth, but usually within the first hour after delivery." ILL. ADMIN. CODE tit. 77, § 250.1830(g)(8). And Illinois law specifies that "a physician treating a child may take or retain temporary protective custody of the child" to administer necessary medical care under appropriate circumstances. 325 ILCS 5/5 ¶ 1. To the extent the Medical Center may have modeled its internal procedures around public guidelines, this cannot support an inference of "joint action." *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Thus, the Scotts' complaint fails to support the assertion that the University of Chicago Medical Center defendants' actions were made possible by Section H.

What's more, the Scotts' allegations reveal more *conflict* between the University of Chicago Medical Center and state actors than joint action. Nothing in DCFS's Section H policy required doctors to take temporary custody of newborns, but the Medical Center's internal policy did. Moreover, DCFS ultimately rescinded Section H—determining it "inappropriately identifie[d]" what can and should be considered as "medically necessary." The Medical Center, however, continued recommending protective custody for newborns in instances of Vitamin K refusal. Indeed, the Scotts' baby was born six months after Section H was rescinded and the Medical Center's restrictive Vitamin K policy was still in place. Finally, when Dr. Liou threatened to take protective custody of the Scotts' newborn, Chicago police officers that were called to the scene put a stop to it. By including these allegations in their complaint, the Scotts have shown the absence of a conspiracy between the Medical Center and DCFS.

*2. Silver Cross Hospital*

Two sets of parents—the Boughers and the Koseks—allege that Silver Cross Hospital, several of its doctors, and a nurse acted under color of state law by conspiring with DCFS. They claim that the hospital had a policy or practice of coercing parents into consenting to Vitamin K shots for newborns under the threat of reporting the parents to DCFS or taking protective custody of the newborn. Indeed, after the Boughers refused administration of Vitamin K for their newborn, Nurse Kozuch took the newborn and told the Boughers that she was reporting them to DCFS. Similarly, Dr. Skalski threatened the Boughers with a DCFS investigation to try to get them to accept the Vitamin K shot.

For the Koseks, a Silver Cross nurse allegedly told them that DCFS would be called due to their refusal of the Vitamin K shot. The head of pediatrics at Silver Cross reinforced this by telling the Koseks that the hospital could take their baby away if they continued to refuse the Vitamin K shot.

When reviewing these allegations, it appears Silver Cross employees invoked DCFS as a threat to coerce the parents to agree to the administration of the Vitamin K for their newborns, but there is nothing to suggest that the hospital and DCFS "had a meeting of the minds" about this issue. *Wilson*, 830 F.3d at 468.

The fact that Illinois's statutory and regulatory backdrop permitted Silver Cross's conduct confirms this conclusion. While we recognize that DCFS's Section H policy—which deemed the refusal of Vitamin K administration to be "medical neglect"—was in place when Baby B and Baby K were born, Illinois regulations also required the administration of

Vitamin K to newborns "shortly after birth, but usually within the first hour after delivery." ILL. ADMIN. CODE tit. 77, § 250.1830(g)(8). Also, the law allowed physicians "treating a child [to] take or retain temporary protective custody of the child" to administer necessary medical care under appropriate circumstances. 325 ILCS 5/5 ¶ 1. The allegations in the complaint show that Silver Cross and its staff were aware of and acted in accordance with this guidance. Mere compliance with state regulations or guidelines cannot transform a private entity into a state actor. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) ("[T]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State … ."). Nor is there merit to the parents' argument that the state regulations were implemented as "cover" for the hospital's policy, as neither Silver Cross nor any of its employees are alleged to have participated in the creation of any of the state rules, including DCFS's Section H policy. At most, the Bougher and Kosek complaint asserts that Silver Cross's internal policy of reporting parents who refused Vitamin K shots to DCFS was inspired by already-in-place state agency guidelines. This is not enough. *Lugar*, 457 U.S. at 937.

* * *

For these reasons, we are unable to infer that DCFS conspired with the defendants to deprive the parents of their constitutional rights.

### B. Public Function

The parents next invoke the "public function" theory of state action, whereby a private individual acts under color of law when he or she "exercise[s] … powers traditionally

exclusively reserved to the State." *Jackson*, 419 U.S. at 352; *see Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157 (1978). In these cases, the private actors are "clothed with the authority of state law." *Rodriguez*, 577 F.3d at 825. The parents argue that taking children into protective custody is exclusively a public function.

Notably, only the Boughers' newborn was taken into protective custody and, as explained above, they waived any argument that Silver Cross or its employees were performing a public function. And while the Scotts preserved the public function argument for appeal, they allege only that Dr. Liou *threatened* to take custody of their child.

We assume—but do not decide—that taking temporary protective custody of a child is an exclusive and traditional function of the state. But, here, the University of Chicago Medical Center did not "exercise" that function, *Jackson*, 419 U.S. at 352, given that Dr. Liou never took the Scotts' newborn away from them. The Scotts have pointed to no case in which the mere threat of performing a traditional state function transforms a private actor into one acting "under color of state law." Given that the Scotts have failed to show Dr. Liou and the University of Chicago Medical Center performed a public function, this theory fails.[9]

_____

[9] The parents argue that our decision in *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, outlined a fourth set of state action factors that likewise supports their theory that the hospitals and their employees were acting under color of state law. That decision, however, simply considered the "public function" question as it applies to medical providers in state prisons. *Rodriguez*, 577 F.3d at 826. The case focused primarily on "the relationship among the state, the health care provider *and* the prisoner,"

### C. Symbiotic Relationship or Entwinement

Lastly, the parents contend that the hospitals and their employees were interdependent "to the point of largely overlapping identity." *Brentwood Acad.*, 531 U.S. at 303. As before, only the Scotts have preserved this "entwinement" theory of state action, so we only consider their allegations against the University of Chicago Medical Center and Dr. Liou.

The Scotts argue that, when Dr. Liou threatened to call DCFS if the Scotts did not consent to the Vitamin K shot, "any reasonable person would see the two entities as working together." But this type of state action is premised on whether the entities are *actually* entwined, not whether they appear to be. *See Brentwood Acad.*, 531 U.S. at 303. And even taking the Scotts' argument on its own terms, "working together" is not enough. Instead, there is state action only when public and private entities are interdependent "to the point of largely overlapping identity." *Id.* at 300–03 (allowing § 1983 claims to proceed against a private athletic association when the association was entwined with the state from the "bottom up" through membership largely made up of public schools and from the "top down" through state appointment of board members and association employees' inclusion in state

_____

recognizing that, in a prisoner context, the state is "the ultimate responsible party for the prisoner's health care." *Id.* at 826–27 (emphasis in original). Here, the state had no control or coercion over the newborns' medical care, nor was there a contract between the state and the defendant providers to care for the newborns (an "important factor" in *Rodriguez*). *Id.* at 827. Thus, *Rodriguez* does little to guide our analysis. We have never applied the factors from *Rodriguez* outside of the prison context and will not do so here.

retirement plans). The Scotts' allegations reveal no such inter-dependence here.[10]

### III. CONCLUSION

Without state action there can be no § 1983 liability. For this reason, we AFFIRM the district court's dismissals of the parents' claims.

---

[10] Because Silver Cross was not acting under color of state law, we need not address the parties' argument that *Monell* liability applies. *See Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (noting that, to state a *Monell* claim against a private corporation, a plaintiff must allege that the corporation was acting under color of state law). Similarly, because none of the hospital employees acted under color of state law, we need not address the parents' invitation to overturn our holding in *Iskander* that plaintiffs cannot premise § 1983 claims on *respondeat superior* liability. *See id*.